594 S.E.2d 511

**Cynthia P. GOLDSTON, Personal Representative of the Estate of Neil Bryan Goldston, Sr., Appellant,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Respondent.**

**No. 3749.**

Court of Appeals of South Carolina.

Heard Jan. 13, 2004.

Decided March 1, 2004.

Rehearing Denied April 22, 2004.

160

Neil D. Wright, of Myrtle Beach, for Appellant.

Linda Weeks Gangi, of Conway, for Respondent.

HEARN, C.J.:

Cynthia P. Goldston, as personal representative to the estate of Neil Bryan Goldston, Sr., appeals the special refer-

ee's ruling in favor of State Farm Mutual Automobile Insurance Company in this declaratory judgment action concerning State Farm's obligation to pay underinsured motorist coverage benefits. We affirm, as modified.

## FACTS

The facts in this case are undisputed. On August 22, 1991, Rickie D. Johnson was driving a pickup truck along a highway in Georgetown County, South Carolina. The truck ran off the highway and struck Neil Bryan Goldston, Sr., who died from injuries sustained in the collision. Johnson was involved in repossessing three vehicles on behalf of his employer, American Lenders Service Company of Charleston, Inc., at the time of the accident.

The truck driven by Johnson was insured under a policy issued by the South Carolina Insurance Company. This policy contained liability limits of $100,000 per person. At the time of the accident, the truck was titled under the name "S.C. Auto Sales & Recovery, by A.M Sprague, V.P." S.C. Auto Sales and Recovery is not, and never has been, a registered corporation, partnership, or other legal entity.

In 1974, Sprague formed a South Carolina corporation under the name of Southern Recovery Service, Inc., for the operation of a "collateral recovery" or repossession business. By amendment to the articles of incorporation, the business was renamed to South Carolina Auto Recovery Services, Inc. Sprague was the sole owner and stockholder of this corporation.

In September 1979, Sprague acquired a franchise from American Lenders Service Company of Odessa, Texas ("American of Texas") for the operation of a collateral recovery business under the name American Lenders Service Company of Charleston. From this time forward, the business of South Carolina Auto Recovery Services, Inc. was conducted under the name of American Lenders Service Company of Charleston. In 1984, Sprague and his wife, Linda, created a new South Carolina corporation under the name of American Lenders Service Company of Charleston, Inc. ("American of Charleston"). They are the company's sole owners, officers, and directors, and Sprague is an employee. All of the operat-

ing assets of South Carolina Auto Recovery Service, Inc. were transferred to American of Charleston, and South Carolina Auto Recovery Service, Inc. was dissolved in June 1985.

Although the Spragues have conducted their business under the name of American of Charleston since 1979, the trucks used to perform their repossession business were both titled and insured under the name of S.C. Auto Sales & Recovery. Even trucks purchased after the incorporation of American of Charleston were titled and insured under the name of S.C. Auto Sales & Recovery.

American of Charleston paid the purchase price of the truck Mr. Johnson was driving at the time of the accident as well as all of the insurance, taxes, gas, upkeep, and registration expenses. The truck is listed as an asset on American of Charleston's financial statements, and American of Charleston claimed depreciation of the truck on its income tax returns. Furthermore, the truck was used to repossess vehicles on behalf of American of Charleston, and was being so used at the time of the accident.

Appellant, the decedent's personal representative, commenced wrongful death and survival actions against the driver of the truck, the Spragues d/b/a S.C. Auto Sales and Recovery, American of Charleston, American of Texas, and General Motors Acceptance Corporation d/b/a GMAC Financial Services. All parties answered denying liability for Goldston's death.

The parties reached a settlement in which the Appellant received $700,000. The liability insurance carrier on the truck involved in the accident, South Carolina Insurance Company, paid its limits of $100,000. The remainder of the settlement was paid by National American Insurance Company ("National"). American of Charleston maintained an insurance policy with National consisting of a commercial general liability coverage, commercial auto coverage, and commercial inland marine coverage, which contained limits of $1,000,000. American of Texas, the franchisor of American of Charleston, maintained an additional commercial policy with National, which had essentially the same commercial general liability coverage, commercial auto coverage, and commercial inland marine cov-

erage as the policy issued by National to American of Charleston. This policy also contained limits of $1,000,000.

State Farm, the Respondent, issued an automobile insurance liability policy to the decedent, Goldston, which contained underinsured motorist coverage in the amount of $50,000 per person. State Farm consented to the settlement agreement described above, which ended both the wrongful death and survival claims against all defendants, while agreeing to preserve Appellant's claim to the underinsured motorist benefits under the State Farm policy. State Farm also stipulated that the damages recoverable in the actions brought by Appellant exceeded $150,000.

Appellant commenced this declaratory judgment action by filing a complaint seeking to determine whether State Farm was under an obligation to pay the underinsured motorist benefits contained in the policy issued to the decedent. By agreement of the parties, the matter was referred to a special referee. After two hearings, the special referee issued an order dismissing the action.

The referee's order states the issue to be decided was whether the commercial auto coverage or the commercial general liability coverage under the National policies issued to American of Charleston and American of Texas constitute " 'applicable bodily injury liability and property damage liability insurance policies or bonds that apply to the bodily injury suffered by [the decedent].' "

The significance of this question lies in the fact that if the policies constituted liability policies applicable to the decedent, then by definition, the vehicle driven by Johnson could not be underinsured because these policies would provide coverage in excess of the $150,000 in damages stipulated to by the parties. Therefore, Appellant would not be entitled to collect the $50,000 in underinsured benefits provided for in State Farm's policy.

The special referee proceeded to make several conclusions of law, all of which Appellant argues were in error. First, the referee determined that the status of the at-fault vehicle, for purposes of the insurance policies issued by National to American of Charleston and American of Texas, was that of a "nonowned" vehicle or, in the alternative, a "hired auto." By

making this determination, the referee concluded that the commercial auto coverage, as defined in the garage coverage form under the policies issued by National, provided applicable coverage to satisfy Appellant's claims.

The second conclusion of law asserted that, regardless of how the court characterized the at-fault vehicle under the National policies, coverage existed to pay Appellant's claims because at the time of the accident the vehicle was being used for garage operations. Thus, the special referee concluded the vehicle, and by necessity the accident, were covered under the commercial auto coverage section of the National policies. In fact, the referee went on to state that because the "clear and unambiguous language of the policy provides coverage for garage operations," and because the driver of the truck was performing garage operations at the time of the accident, clearly the National policies provided coverage.

The special referee's third conclusion of law was that coverage was also available for Appellant's claims under the commercial general liability coverage section of the National policies. Specifically, after interpreting the pertinent provisions of the policies, the referee held that because there were no applicable exclusions placing the acts of the at-fault driver outside the policy, coverage was available under the commercial general liability coverage section of the policy.

Appellant's motion for reconsideration of the referee's rulings was denied.

## ISSUES

I. Did the referee err in excluding certain facts from his order of dismissal contained in the parties' stipulation of facts and relevant to the issues being ruled upon?

II. Did the referee err by concluding that the truck operated by Johnson at the time of the accident was a "non-owned auto" or, in the alternative, a "hired auto" for purposes of the commercial auto coverage section of the insurance policies issued by National to American of Charleston and American of Texas?

III. Did the referee err in concluding that the commercial auto coverage section of the insurance policies issued

to American of Charleston and American of Texas provided liability insurance to pay the claims of Appellant because Johnson was involved in garage operations at the time of the accident?

IV. Did the referee err in concluding that the commercial general liability coverage section of the policies issued to American of Charleston and American of Texas provided coverage to pay the claims of Appellant?

V. Did the referee err in failing to conclude that there was a gap in coverage between the at-fault vehicle and the policies issued to American of Charleston and American of Texas?

VI. Assuming coverage existed under the policies issued by National to American of Charleston and American of Texas, did the referee err nevertheless in failing to conclude that these policies should not be taken into consideration when determining whether the vehicle was underinsured for purposes of receiving underinsured motorist benefits?

## STANDARD OF REVIEW

 Because declaratory judgment actions are neither legal nor equitable, the standard of review depends on the nature of the underlying issues. *Campbell v. Marion County Hosp. Dist.*, 354 S.C. 274, 279, 580 S.E.2d 163, 165 (Ct.App. 2003) (citations omitted). When the purpose of the underlying dispute is to determine if coverage exists under an insurance policy, the action is one at law. *Horry County v. Ins. Reserve Fund*, 344 S.C. 493, 497, 544 S.E.2d 637, 639–640 (Ct.App. 2001) (citing *State Farm Mut. Auto. Ins. Co. v. Calcutt*, 340 S.C. 231, 530 S.E.2d 896 (Ct.App.2000)). In an action at law, tried without a jury, the appellate court will not disturb the trial court's findings of fact unless they are found to be without evidence that reasonably supports those findings. *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). However, " '[w]hen an appeal involves stipulated or undisputed facts, an appellate court is free to review whether the trial court properly applied the law to those facts.' " *In re Estate of Boynton*, 355 S.C. 299, 301, 584 S.E.2d 154, 155 (Ct.App.2003) (quoting *WDW Props. v. City of*

*Sumter*, 342 S.C. 6, 10, 535 S.E.2d 631, 632 (2000)). In such a situation, the appellate court does not have to defer to the trial court's findings. *Id.* at 301–02, 584 S.E.2d at 155 (citations omitted).

## LAW/ANALYSIS

### I. Stipulation of Facts

■ Appellant argues the special referee erred in selecting facts from the stipulation of facts submitted by the parties because his order dismissing the case did not contain facts Appellant feels were pertinent to the issue under consideration. We disagree.

Although the referee premised the original order dismissing the case by noting the parties "entered into the following Stipulations of Facts," this assertion was corrected in the referee's order ruling on Appellant's motion for reconsideration. In the later order, the referee corrected his previous assertion by noting that the facts in the original order were taken from the parties' stipulation of facts. The referee stated that the original order should have begun with the assertion that "[t]he parties entered into a Stipulation of Facts prior to the hearing in the above-captioned action and this Court deemed the following facts salient to its decision."

Thus, because the referee corrected any possible error in his order on Appellant's motion for reconsideration, we find this argument to be without merit.

### II. Status of the At–Fault Vehicle

Appellant argues the referee erred in his determination that the at-fault vehicle was either a "non-owned auto" or a "hired auto" under the commercial auto coverage section of the insurance policies. We agree.

The commercial auto coverage sections in the National policies issued to American of Charleston and American of Texas provide, in pertinent part, that the policies supply liability coverage in the amount of $1,000,000. The policies explain that the coverage will only apply to "those 'autos' shown as covered 'autos'. 'Autos' are shown as covered 'autos' by the entry of one or more of the symbols from the COV-

ERED AUTOS Section of the Garage Coverage Form next to the name of the coverage." Beside the coverage section titled liability in the American of Charleston and American of Texas policies appear the symbols 28 and 29.

The definitions for symbols 28 and 29 are located in Section I of the garage coverage form contained in the commercial auto coverage section of the policies. Section I begins with a disclaimer which provides, in pertinent part, that "[t]he symbols entered next to a coverage on the Declarations designate the only 'autos' that are covered 'autos'." Following this disclaimer, section I goes on to define the available symbols, including 28 and 29. The following definition is located next to symbol 28: "HIRED 'AUTOS' ONLY. Only those 'autos' you lease, hire, rent or borrow. This does not include any 'auto' you lease, hire, rent or borrow from any of your employees or partners or members of their households." The definition next to symbol 29 provides: "NON–OWNED 'AUTOS' USED IN YOUR GARAGE BUSINESS. Any 'auto' you do not own, lease, hire, rent or borrow used in connection with your garage business described in the Declarations. This includes 'autos' owned by your employees or partners or members of their households while used in your garage business."

█ Before making the determination that the at-fault vehicle was either a hired auto or non-owned auto, the special referee stated that while "[a]t first blush, one could believe that this Court's job was to determine the legal owner of the vehicle driven by Rickie Johnson in order to determine coverage. That is not the case. The Court must determine for purposes of the insurance policies what the status is of the vehicle driven by Rickie Johnson." We disagree with this statement. We believe that legal ownership is exactly what this court must determine before we can rule on whether the vehicle was a covered auto.

As clearly stated in the policy language in the excerpt above, the only autos covered under the policy are those falling within the purview of symbols 28 and 29. Symbol 28 refers to hired autos as autos "you lease, hire, rent or borrow." Similarly, symbol 29 encompasses only those autos that are not owned. Therefore, to determine whether coverage

exists, this court must examine the ownership status of the at-fault vehicle.

■■ "Though a certificate of title constitutes prima facie evidence of ownership for purposes of insurance coverage, this presumption can be rebutted by evidence establishing some-one other than the titleholder is the true holder." *Pennell v. Foster,* 338 S.C. 9, 15, 524 S.E.2d 630, 633 (Ct.App.1999) (citing *Tollison v. Reaves,* 277 S.C. 443, 445, 289 S.E.2d 163, 164 (1982)). Although in this case, the at-fault vehicle was titled and insured under the name of S.C. Auto Sales & Recovery, the evidence clearly established that American of Charleston was its true owner. American of Charleston paid the purchase price of the truck, as well as all insurance, taxes, gas, and required maintenance. American of Charleston also maintained possession of the truck and controlled the determi-nation of how and when it would be utilized. American of Charleston listed the truck as an asset on its financial state-ments and claimed depreciation of the truck on the company's tax returns. Finally, at the time of the incident, the truck was being utilized to repossess three vehicles on behalf of Ameri-can of Charleston.

We find these additional facts adequate to rebut the prima facie evidence of ownership established by the title alone. Therefore, we hold that American of Charleston was the legal owner of the truck at the time of the incident. Accordingly, because American of Charleston owned the truck at the time of the incident, it was neither a hired auto—because it was not leased, hired, rented, or borrowed—nor a non-owned auto under the policy issued by National to American of Charles-ton. As such, we find the vehicle was not a covered auto under the commercial auto coverage section of the policy.

### III. Commercial auto coverage

The special referee held that regardless of how the vehicle was characterized—as either a hired auto, non-owned auto, or owned auto—coverage existed because the vehicle was being used for garage operations at the time of the accident. Appel-lant argues this ruling was in error. We affirm the special referee on alternate grounds.

Insurance contracts are subject to "the general rules of contract construction." *Hansen ex rel. Hansen v. United Services Auto. Ass'n*, 350 S.C. 62, 68, 565 S.E.2d 114, 116 (Ct.App.2002) (citing *Standard Fire Ins. Co. v. Marine Contracting & Towing Co.*, 301 S.C. 418, 421, 392 S.E.2d 460, 461 (1990)). The primary purpose of all rules of contract construction is to determine the intent of the parties. *Id.* (citation omitted). "If the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003) (citation omitted).

" '[A] contract is ambiguous only when it may fairly and reasonably be understood in more ways than one.' " *Hansen*, 350 S.C. at 68, 565 S.E.2d at 117 (quoting *Universal Underwriters Ins. Co. v. Metro. Prop. & Life Ins. Co.*, 298 S.C. 404, 407, 380 S.E.2d 858, 860 (Ct.App.1989)). "Where language used in an insurance contract is ambiguous, or where it is capable of two reasonable interpretations, that construction which is most favorable to the insured will be adopted." *Id.* (quoting *Poston v. Nat'l Fid. Life Ins. Co.*, 303 S.C. 182, 187, 399 S.E.2d 770, 772 (1990)).

The schedule of coverages and covered autos contained in the commercial auto coverage section of the National policies provides:

> This policy provides only those coverages where a charge is shown in the premium column below. *Each of these coverages will apply only to those 'autos' shown as covered 'autos'.* 'Autos' are shown as covered 'autos' for a particular coverage by the entry of one or more of the symbols from the COVERED AUTOS Section of the Garage Coverage Form next to the name of the coverage. *Entry of a symbol next to LIABILITY provides coverage for 'garage operations'.*"

(emphasis added).

After considering this provision of the policies, the special referee reasoned that because symbols 28 and 29 appear beside the coverage titled liability, coverage also existed for garage operations. Section VI of the garage coverage form contained in the commercial auto coverage section of the policies defines garage operations as follows:

"Garage operations" means the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. *"Garage operations" includes the ownership, maintenance or use of the "autos" indicated in SECTION I of this Coverage Form as covered "autos". "Garage operations" also include all operations necessary or incidental to a garage business.*

(emphasis added).

The special referee considered the language contained in this definition along with the appearance of symbols 28 and 29 on the declarations page, and stated that "there can be no question but that there is liability coverage for garage operations which includes all operations necessary or incidental to a garage business." The referee concluded that because the at-fault driver was engaged in repossessions when the accident occurred, he was performing tasks necessary and/or incidental to American of Charleston's garage business. In fact, the referee stated, "The clear and unambiguous language of the policy provides coverage for garage operations. [The at-fault driver] was performing garage operations at the time [the decedent] was killed; thus, coverage is provided by the [National] policies."

To add support to this statement, the referee examined Section II of the garage coverage form contained in the commercial auto coverage section of the National policies, which explains the liability coverage under that section. First, the form defines who an insured is for covered autos. The form then defines who an insured is other than for covered autos, stating, " 'insureds' for 'garage operations' *other than covered 'autos,'* " include American of Charleston or American of Texas and their "partners, employees, directors or shareholders but only while acting within the scope of their duties." (emphasis added). Because the at-fault driver was an employee of American of Charleston, the referee concluded that he was an insured for purposes of the policy and that it did not matter whether the at-fault vehicle was a covered auto or not.

Finally, the referee examined the general insuring agreement, which provided that National "will pay all sums an 'insured' legally must pay as damages because of 'bodily

injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from 'garage operations.' "

Taking all of the above excerpted provisions together, the special referee concluded that coverage existed under the commercial auto coverage section of the National policies because the at-fault driver was an insured and because the decedent's injuries constituted bodily injury, were caused by an accident, and resulted from garage operations.

We agree with the referee's conclusion that coverage existed under the commercial auto coverage section of the National policies. However, we disagree that the policy clearly and unambiguously provided coverage under the facts of this particular case.

As Appellant points out, the special referee's interpretation of the policy provisions at issue renders pointless the designation of specific classes of autos included in the covered autos section of the policy. American of Charleston chose to include only symbols 28 and 29 on the covered autos section of the commercial auto coverage section of the National policies. It had the option of choosing from among eleven possible auto designations, but only chose two, indicating the covered autos under the commercial auto section of the policies would include only hired autos and non-owned autos.

The referee read the last sentence of the garage operations definition together with the definition of insureds for garage operations as preempting the designations of vehicles contained on the garage coverage form in the commercial auto coverage section of the National policies. The last sentence of the garage operations definition states that " '[g]arage operations' also include all operations necessary or incidental to garage business." Further, the policy states that " 'insureds' " for 'garage operations' other than covered 'autos,' " includes employees of American of Charleston or American of Texas. The special referee's interpretation of these provisions would have the policy providing coverage for any accident involving garage operations no matter what designation of auto was involved. Thus, even though American of Charleston only chose to include hired autos and non-owned autos on the garage coverage form, if an accident involving garage opera-

tions occurred with a vehicle not falling within these designations, it would still be covered as garage operations under the commercial auto section of the National policies.

Because we find that the policy language limiting coverage to non-owned and hired autos materially conflicts with the policy language defining garage operations and insureds for garage operations, we find that the policy provisions are open to more than one reasonable interpretation. Accordingly, we conclude that the policy provisions at issue are ambiguous. *Hansen,* 350 S.C. at 68, 565 S.E.2d at 117. Therefore, based on the premise that ambiguous or conflicting terms in an insurance contract should be construed in favor of the insured and strictly against the insurer, we affirm the special referee in finding the commercial auto liability coverage section of the National policies provided coverage for Appellant's claims. *Diamond State Ins. Co. v. Homestead Indus., Inc.,* 318 S.C. 231, 236, 456 S.E.2d 912, 915 (1995).

## IV. Commercial General Liability Coverage

The special referee ruled that coverage also existed under the commercial general liability coverage section of the policies issued by National to American of Charleston and American of Texas. Appellant maintains this ruling was in error. We agree.

As noted in the discussion of the previous issue, the general insurance agreement provides that National "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." An "insured," for purposes of the commercial general liability coverage section of the National policies, includes employees acting within the scope of their employment. The referee concluded Johnson was an insured under the commercial general liability coverage section because he was engaged in the repossession of vehicles at the time of the accident and thus, was acting within the scope of his employment.

The commercial general liability coverage section contains an exclusion from coverage, however, which provides, in pertinent part, that coverage does not apply to " '[b]odily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or water-

craft owned or operated by or rented or loaned to any insured."

The referee found this exclusion did not apply to American of Charleston because Appellant asserted multiple causes of action in the underlying complaint that did not involve the use of an auto, including a cause of action for negligent hiring and supervision. The referee further held that because the cause of action for negligent hiring and supervision did not fall within the exclusion, coverage was provided under the policies. On appeal, State Farm argues that Appellant's causes of action for negligent hiring and supervision as well as negligence in failing to provide the financial resources necessary to safely perform repossession, failing to maintain a proper fleet of repossession equipment, requiring employees to undertake excessive amounts of work, and requiring employees to mainly work at night fall outside the auto exclusion in the commercial general liability coverage section. We disagree.

In finding Appellant's causes of action did not involve the use of an auto, both the referee's order and State Farm's argument on appeal fail to recognize the specific language contained in the auto exclusion. The exclusion provides, "[t]his insurance does not apply to ... 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment of others of an ... 'auto'...." The terms bodily injury and property damage are both defined terms in the insurance contract. Bodily injury is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Property damage is defined as "(a) [p]hysical injury to tangible property, including all resulting loss of uses of that property; or (b) [l]oss of use of tangible property that is not physically injured." Neither of these definitions limits the application of the auto exclusion only to *causes of action* that arise out of the use or entrustment of an auto. Rather, these definitions assure the parties that the auto exclusion applies to all bodily injury and property damage arising out of the use or entrustment of an auto. *See McPherson v. Michigan Mut. Ins. Co.,* 310 S.C. 316, 320, 426 S.E.2d 770, 771 (1993) ("[H]old[ing] that for the purpose of construing an exclusionary clause in a general liability policy, 'arising out of' should be narrowly

construed as 'caused by.' "); *MGC Mgmt. Of Charleston, Inc. v. Kinghorn Ins. Agency,* 336 S.C. 542, 549–50, 520 S.E.2d 820, 824 (Ct.App.1999) (stating that an automobile exclusion applied to the occurrence itself and not the type of damages, and because the death arose from use of a car, the policy excluded damages emanating from the death). In this case, regardless of what specific cause of action Appellant asserted in the complaint, Appellant was seeking to recover damages for bodily injury. Furthermore, Appellant was seeking damages for bodily injury arising out of the use or entrustment of an auto because decedent's injuries resulted from being struck by an auto driven by an employee of American of Charleston. As a result, we find no applicable coverage under the commercial general liability coverage section of the National policies because the auto exclusion specifically excluded coverage for decedent's injuries. ·

## V. Gap in Coverage

█ Appellant asserts the special referee erred in failing to conclude that the at-fault vehicle was not an underinsured vehicle even if liability coverage existed under the National policies. This argument is premised on the idea that coverage under the National policies, if any, constituted excess coverage because it was above and beyond the coverage required under the South Carolina Motor Vehicle Financial Responsibility Act.[1] As such, Appellant asserts there was a gap in coverage due to the deductible contained in the National policies and that the State Farm underinsured motorist benefits should apply to cover that gap. The referee declined to find such a gap in coverage. We agree.

As State Farm correctly points out, the only deductible contained in the National policies is a $25,000 per claim deductible on bodily injury and property damage under the commercial general liability coverage section of the policies. Because we have previously determined that coverage does not exist to cover Appellant's claims under the commercial general liability coverage section, this deductible would be inapplicable.

---

1. S.C.Code Ann. §§ 56–9–10 to –630 (1991 and Supp. 2003).

Furthermore, even though we previously concluded that coverage existed under the commercial auto section of the policies, that section of the policies is not subject to a deductible. As a result, we find that the referee did not err in declining to find a gap in coverage.

## VI. Consideration of Other Policies

Appellant asserts that, even assuming coverage existed under the National policies, the referee erred in failing to conclude that these policies should not be taken into consideration when determining whether the vehicle was underinsured for the purpose of receiving underinsured motorist benefits. Appellant argues that under the compulsory system of automobile liability insurance established by the South Carolina Motor Vehicle Financial Responsibility Act, only "motor vehicle liability polic[ies]," as defined by S.C.Code Ann. § 56–9–20(5) (Supp.2003) [2] should be taken into consideration when determining whether an insured is entitled to underinsured motorist benefits. We disagree.

Section 56–9–20(5) of the South Carolina Code (Supp.2003) defines a motor vehicle liability policy, in relevant part, as:

An owner's or an operator's policy of liability insurance that fulfills all the requirements of §§ 38–77–140 through 38–77–230, certified as provided in § 56–9–550 or 56–9–560 as proof of financial responsibility and issued, except as otherwise provided in § 56–9–560, by an insurance carrier duly authorized to transact business in this State, to or for the benefit of the person or persons named therein as insured, and any other person, as insured, using the vehicle described therein with the express or implied permission of the named insured and subject to the following conditions . . . .

Appellant asserts that the National policies at issue in this case did not constitute motor vehicle liability policies, even if they do provide coverage for decedent's injuries, because the policies did not provide vehicle specific coverage as required by the definition of a motor vehicle liability policy.

---

**2.** This code section appears as § 56–9–20(7) in the 1991 Code.

█ In support of this argument, Appellant asks this court to read the definition of "insured motor vehicle," found in the Financial Responsibility Act, together with the definition of "underinsured motor vehicle," found in the automobile insurance chapter[3] of the code, to find that the only relevant insurance policies, for purposes of underinsured motorist coverage, are motor vehicle liability policies.

Section 56–9–20(1) of the South Carolina Code (Supp.2003) defines an insured motor vehicle as follows:

A motor vehicle as to which there is bodily injury liability insurance and property damage liability insurance, meeting all of the requirements of item (7)[4] of this section, or as to which a bond has been given or cash or securities delivered in lieu of such insurance or as to which the owner has qualified as a self-insurer in accordance with the provisions of § 56–9–60. . . .

Section 38–77–30 (15) of the South Carolina Code (2002 and Supp. 2003) defines an underinsured motor vehicle as:

[A] motor vehicle as to which there is bodily injury liability insurance or a bond applicable at the time of the accident in an amount of at least that specified in Section 38–77–140 and the amount of the insurance or bond is less than the amount of the insureds' damages.

█ We decline to limit the definition of underinsured motor vehicle to those with vehicle specific liability insurance. Courts must take a statute as it is drafted and give effect to the legislative intent as expressed in its language. *See State v. White*, 338 S.C. 56, 58, 525 S.E.2d 261, 263 (Ct.App.1999). A subtle or forced construction of words in a statute for the purpose of expanding the operation of a statute is prohibited. *See Moon v. City of Greer*, 348 S.C. 184, 188, 558 S.E.2d 527, 530 (Ct.App.2002). Furthermore, "[t]he lawmaking body's construction of its language by means of definitions of the terms employed should be followed in the interpretation of the

---

3. S.C.Code Ann. §§ 38–77–10 to –1160 (2002 and Supp. 2003).

4. Presumably, the South Carolina General Assembly intended to amend this section reference to read "item (5)". In the 1991 Code, item 7 defines motor vehicle liability policy. However, in the 2003 Supplement, item 5 defines motor vehicle liability policy, while item 7 defines nonresident operating privilege.

act or section to which it relates and is intended to apply." *Fruehauf Trailer Co. v. South Carolina Electric & Gas Co.,* 223 S.C. 320, 325, 75 S.E.2d 688, 690 (1953).

Notably, the definition of an underinsured motor vehicle does not contain the requirement that the applicable insurance meet all the elements of a motor vehicle liability policy as the definition of an insured motor vehicle does. Rather, an underinsured motor vehicle is defined as one to which there is *bodily injury liability insurance*[5] at the time of the accident and the amount of the insurance is less than the amount of the insured's damages. In this case, there was bodily injury liability insurance at the time of the accident from both the South Carolina Insurance Company policy and, as discussed above, the commercial auto coverage section of the National policies.

Furthermore, the State Farm underinsured motorist coverage contained the following provision: "There is no coverage until the limits of liability of all applicable bodily injury liability and property damage liability insurance policies or bonds that apply to the bodily injury or property damage have been used up by payment of judgments or settlements." An endorsement to the State Farm policy contains a definition of an underinsured motor vehicle almost identical to the definition of an underinsured motor vehicle contained in section 38–77–30(14). The endorsement states that "a motor vehicle, as to which there is bodily injury liability insurance or bond applicable at the time of the accident in an amount of at least that specified in the *Financial Responsibility Act* and the amount of insurance or bond is less than the amount of the insured's damages." Because the National policies are applicable bodily injury liability policies, we find the provision in the State Farm policy excluding underinsured motorist coverage until the limits of liability of all applicable bodily injury liability policies have been exhausted is effective to bar Appellant's claim for underinsured motorist coverage under the State Farm policy.

## CONCLUSION

Based on the foregoing, we agree with the Appellant that the special referee erred in concluding the truck operated by

---

5. There is no statutory definition for bodily injury liability insurance.

Johnson at the time of the accident was a non-owned or hired auto. We further agree with Appellant that the referee erred in concluding that the commercial general liability coverage section of the National policies provided coverage for Appellant's claims. However, because we find that coverage existed under the commercial auto coverage section of the policies, that no gap in coverage existed, and that the National polices should be considered in determining whether the vehicle was underinsured for purposes of receiving underinsured motorist benefits, we affirm the special referee's decision to dismiss the action, as modified by this opinion.

**AFFIRMED AS MODIFIED.**

HUFF and BEATTY, JJ., concur.